IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD DEMARCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 049 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Magistrate Judge Sheila Finnegan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Demarco seeks to overturn the final decision of Defendant Commissioner of Social Security denying his application for disability insurance benefits under the Social Security Act. 42 U.S.C. §§ 216(i) and 223(d). After the parties consented to the jurisdiction of the United States Magistrate Judge, Plaintiff filed a motion for summary judgment asking the Court to award him benefits or, in the alternative, remand the case for further consideration. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the record, the Court now grants Plaintiff's motion, and remands the case for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On July 10, 2000, Plaintiff filed a claim for disability insurance benefits, alleging that he became disabled on December 5, 1997 from constant back pain (following a laminectomy) and arthritis in his hands. (R. 66-68, 86). On October 5, 2000, the Social Security Administration ("SSA") denied his claim, finding that he retained the ability to perform light work. (R. 40-43). Plaintiff did not appeal.

On July 29, 2002, (about eight weeks before his date last insured ("DLI") of September 30, 2002 and one week before his 50th birthday), Plaintiff filed a second application for disability, alleging the same disability and onset date as the first claim.[1] (R. 75-77). After SSA denied this second claim and the subsequent Request for Reconsideration (R. 44-54), Plaintiff sought a hearing before an Administrative Law Judge ("ALJ"). (R. 55-56). ALJ John Mondi held that hearing on August 19, 2004 (R. 289-347), and issued a decision denying Plaintiff's claim for benefits on October 25, 2004. (R. 27-36). The Appeals Council denied Plaintiff's request for review and Plaintiff then sought judicial review. On August 16, 2007, Magistrate Judge Nan R. Nolan remanded the case for further consideration of Plaintiff's credibility and residual functional capacity ("RFC"). *Demarco v. Astrue*, No. 06 C 0121, slip op., at 1-8 (N.D. Ill. Aug. 16, 2007).[2] As a result, the Appeals Council vacated the ALJ's decision and ordered an additional hearing. (R. 367-69).

ALJ Mondi held the second hearing on October 7, 2008. (R. 406-46). On November 4, 2008, the ALJ issued a decision in which he again denied Plaintiff's claim for benefits. (R. 351-59). Since the Appeals Council declined to assume jurisdiction, that decision became the final decision of the Commissioner. Plaintiff again sought judicial review, and the pending motion for summary judgment is now before this Court.

_____

[1]     For reasons not explained in the record, Plaintiff's second disability application is dated November 27, 2002. (R. 75). Since the parties and the ALJ appear to agree that the application was filed on July 29, 2002 (R. 18, 30, 295, 351, 414), and certain SSA documents bear this date (R. 74, 83), the Court will assume this is the correct date.

[2]     Judge Nolan initially granted summary judgment in favor of the Commissioner, (*Demarco v. Astrue*, No. 06 C 0121, slip op. at 1-29 (N.D. Ill. June 5, 2007)), but subsequently granted Plaintiff's motion for reconsideration. (R. 381-88).

2

## OVERVIEW

The facts in this case span fourteen years, beginning with Plaintiff's back injury while working as a tractor trailer driver in late 1994. Following treatment, he returned to work on light duty for several months until his termination in April 1996. Unable to get another job, Plaintiff started his own small engine repair business on a part-time basis out of his garage. In November 1997, Plaintiff experienced great pain after bending over to tie his shoes. His physician diagnosed a herniated disk and performed a laminectomy on December 5, 1997. This is the alleged onset date of Plaintiff's disability.

At a check up six months after the surgery, Plaintiff appeared to be doing fairly well with only occasional localized lower back pain for which his physician prescribed Tylenol with Codeine (no refills). Plaintiff informed his physician that he had resumed his small engine repair work. He continued this activity (and some snow plowing work in winter) over the next several years, though reportedly worked only half days because of the limiting effects of back pain and medication side effects. During these years, at least prior to March 25, 2002, Plaintiff appears to have sought medical treatment for back pain only once in the fall of 2001. While he applied for disability in mid-2000 (and so was seen by DDS consultants), the claim was denied based on a finding that Plaintiff was capable of light duty work and he did not appeal.

It was not until March 25, 2002 (six months before his date last insured and over four years after the alleged onset of the disability), that Plaintiff began seeing a physician (pain management specialist, Dr. Manual P. Blas) for treatment of back pain. After Plaintiff declined to undergo a non-operative procedure (RACZ adhesiolysis) to remove scar tissue, Dr. Blas began a trial with pain medications. Between March 36. 2002 and at least June

11, 2004, Dr. Blas prescribed a series of changing medications in an effort to identify the optimal drugs for Plaintiff. According to Plaintiff, certain of these drugs, namely Oxycontin (prescribed for 10 days in late March 2002 and again beginning in October 2003) and MS Contin, when taken in conjunction with Valium and Soma (prescribed in combination from December 2, 2002 through October 2003) made him feel like a "zombie" and so prevented him from operating vehicles and working with machinery. Plaintiff reportedly closed his engine repair business at some point due to the severity of the pain and medication side effects.

Plaintiff first testified before an ALJ about his symptoms and limitations in July 2004 – more than six years after the onset of the alleged disability and almost two years after his DLI. Plaintiff testified before the same ALJ again in October 2008 after Judge Nolan remanded the case. In both decisions, the ALJ found Plaintiff to have a severe back impairment but did not fully credit his testimony concerning the intensity, persistence and limiting effects of the back pain and pain medications. For these and other reasons, the ALJ concluded that, at least as of the DLI of September 30, 2002, Plaintiff was capable of a restricted range of medium work.

Plaintiff contends that the ALJ erred in his most recent decision because he: (1) failed to comply with Judge Nolan's directive to explain why Plaintiff's claimed limitations could not reasonably be accepted as consistent with the evidence; (2) failed to properly analyze Plaintiff's credibility under SSR 96-7p; (3) impermissibly relied upon testimony of a vocational expert ("VE") and failed to resolve a conflict between that testimony and the Dictionary of Occupational Titles; and (4) erroneously identified Plaintiff's transferable

4

skills. For reasons discussed below, the Court accepts some but not all of these arguments, and remands the case for further proceedings.

## FACTUAL BACKGROUND

### A. Plaintiff's Age and Education

Plaintiff was 45 years old when he allegedly became disabled (R. 412-13), 50 years old on the date last insured, and 56 years old when the ALJ rendered his most recent decision. (R. 35, 412-13). He completed the ninth grade (R. 297), and possibly passed the GED exam.[3] (R. 92, 113, 298). He also received a vocational degree in auto mechanics. (R. 354.)

### B. Initial Treatment Following Back Injury in 1994

Plaintiff reported hurting his back at work on December 3, 1994 while lifting the rear door of a trailer that had become stuck. (R. 202). His back had been sore at times before that, but following this incident, he experienced an "acute onset of low back pain around the beltline and immediately below." (*Id.*). After the injury, Plaintiff saw a company doctor several times and received physical therapy. (*Id.*). The therapist described Plaintiff as having decreased lumbar lordosis, decreased motion in the L4-L5 area, and decreased trunk flexibility due to pain. (R. 159).

About a week after the injury, Plaintiff returned to light duty work. His symptoms worsened, resulting in a referral by an insurance company to Dr. Robert Uteg in early January 1995. (R. 202-03). When he saw Dr. Uteg, Plaintiff reported "radiating left buttock

---

[3] When asked whether he received a high school GED, Plaintiff responded: "I tried. I couldn't pass it." But when informed that one of the disability forms that he completed said he *did* get a GED, Plaintiff said he took the GED and was told that he had passed but never received anything showing this. (R. 298).

5

and posterior thigh pain" on three or four occasions. (*Id.*) Dr. Uteg's impression was lumbar musculoligamentous strain, and he recommended Naprosyn and several more weeks of physical therapy. (R. 203). On February 6, 1995, Dr. Gina Drugas referred Plaintiff for an MRI of his spine. The MRI revealed "degeneration of the L5-S1 disc with a moderate bulging disc at L5-S1, but no evidence of focal disc herniation." (R. 160).

On August 28, 1995, Dr. Harb Boury examined Plaintiff. (R. 200-01). Dr. Boury's impression was a "history suggestive of a bilateral S1 radiculopathy, worse on the right. Rule out central herniated disc at the level of L5-S1, more so to the right side." (R. 201). Dr. Boury recommended a diagnostic lumbar myelogram and CT scan, along with a follow-up visit. (*Id.*) On September 1, 1995, a lumbar myelogram revealed a small anterior extradural defect at the level of L4-L5 and possibly also L5-S1. (R. 192). A CT scan the same day revealed diffuse bulges of the disc at L3-L4 and L4-L5 that mildly effaced the thecal sac centrally, hypertrophy of the ligamentum flavum, and a very mild central bulge of the annulus at L5-S1. (R. 193).

After reviewing the September 1, 1995 diagnostic pictures, Dr. Boury opined that Plaintiff would not benefit from surgical decompression at that time. (R. 199). Dr. Boury noted that Plaintiff would have symptoms of back pain, especially after longer periods of sitting down or driving. (*Id.*). However, Dr. Boury felt that Plaintiff "should be able to do his job after a period of physical therapy," and recommended that Plaintiff lose weight, continue with a variation of physical exercise and swimming, and quit smoking. (*Id.*).

6

**C.** **Termination from Trucking Job in 1996; Self-Employment Repairing Engines**

In April 1996, Plaintiff, who had worked as a truck driver since 1979, was terminated from his position hauling mail. (R. 87, 131, 133, 301-04). According to Plaintiff, the employer said he was terminated for making a threat when trying (unsuccessfully) to get a particular van run in lieu of an alternative and more difficult route that his employer had assigned him. (R. 303-04). Plaintiff denied making a threat and said he simply informed his employer that he did not want to go back on workers' compensation (as he feared would happen if assigned to the more difficult route). (*Id.*).

After his termination, Plaintiff said he had difficulty finding a job because, upon learning that he had a back problem, no one would hire him. (R. 304). In April 1996 or the summer of 1997, he began his own business, repairing engines out of his garage on a part-time basis. (R. 93, 108, 116, 131, 299-300).

**D.** **Laminectomy in December 1997 and Follow-Up Treatment**

On November 17, 1997, Plaintiff returned to Dr. Boury for an "urgent consultation." (R. 170-72). Plaintiff explained that two weeks earlier, he had felt a twinge of pain in his back while bending to tie his shoes. (R. 170). He told Dr. Boury that "[o]ver the next 24 hours, the pain started radiating down to his buttocks bilaterally, worse down the right side, all the way to the calf as well as into his feet." (*Id.*). Plaintiff reported "severe back pain" and occasional numbness and tingling, and informed Dr. Boury that "it is very, very hard just to walk." (*Id.*). After reviewing an MRI of Plaintiff's spine, Dr. Boury diagnosed "a clear-cut herniated disc at the level of L5-S1" and, at L4-L5, "a central herniated disc associated with very significant lumbar spinal canal stenosis." (R. 171). The next day,

7

Plaintiff had a myelogram and CT scan. (R. 186-88). Dr. Boury then confirmed the stenosis and herniated disc at L4-L5, as well as the mild bulge/herniated disc at L5-S1. (R. 181).

In a follow-up visit on November 24, 1997, Dr. Boury recommended a decompressive lumbar laminectomy at L4-L5 and microlumbar diskectomy at L5-S1. (R. 181-82). Dr. Boury performed the surgery (assisted by Dr. Uteg) on December 5, 1997. (R. 165-67). This is also the date of the claimed onset of Plaintiff's disability. During the surgery, Dr. Boury observed "marked thickening of the ligamentum flavum especially at the level of L4-L5 where the myelogram showed an area of stenosis." (R. 166). Dr. Boury also observed a "large central herniated disc at the level of L4-L5" with "almost a cliff feeling to it, suggesting a marked rise in the herniation at the site of the central disk rupture." (*Id.*). Dr. Boury performed a "thorough diskectomy" at L4-L5 and removed the herniated disk such that "the nerve root was free from any compression." (*Id.*). At the L5-S1 disk, Dr. Boury found "an obvious herniated disk" that was "somewhat calcified." (R. 167). After removing the herniation, the doctor noted that "the underside of the dural sac was nicely decompressed." (*Id.*). The postoperative diagnosis was "congenital narrow spinal canal," "central herniated disk at the level of L4-L5," and "herniated disk at the level of L5-S1, left." (R. 165).

During a postoperative visit on December 15, 1997, Dr. Boury observed that Plaintiff was "doing extremely well. His incision is healing nicely, the staples were removed. He is taking just one pain killer per day and has lost 10 pounds." (R. 196). When Plaintiff returned for his next visit with Dr. Boury on January 26, 1998, Plaintiff reported some morning stiffness, which the doctor indicated was to be expected following surgery. (R.

8

195). Dr. Boury noted that Plaintiff was "coming along fairly nicely," and suggested further physical therapy. (Id.).

Plaintiff next returned to Dr. Boury six months later, on June 29, 1998, and reported that he was "very pleased with how things were going with the resolution of his bilateral buttock pain," and that he was "back to working in his garage repairing lawn mowers." (R. 194). Plaintiff complained of occasional localized lower back pain for which he requested Tylenol with Codeine. (Id.). Dr. Boury provided a prescription with no refills, and recommended that Plaintiff lose weight, attend aqua therapy, and quit smoking. (Id.). Dr. Boury indicated that he would see Plaintiff after this "on a PRN [as needed] basis." (Id.).

Based on the medical records later provided to the ALJ, Plaintiff did not seek or receive any treatment for his back pain between June 29, 1998 and October 29, 2001; however, as noted below, Plaintiff was examined by physicians for the Bureau of Disability Determination Services ("DDS") in September 2000 after he filed a disability claim.

### E.    Disability Report and SSA Interview (July 2000)

In July 2000, Plaintiff completed and signed a disability report (R. 85-94), and was interviewed in the SSA field office. (R. 95-102). He reported constant pain in his back since surgery in 1997, as well as arthritis in the hands. (R. 86). Plaintiff indicated that he had been unable to work since his surgery on December 5, 1997. (Id.). He acknowledged working six to nine hours a week (1 to 1.5 hours each day) in his own engine repair business, and noted that this allowed him to rest his back and lay down when needed. (R. 86, 93, 99).

9

In his written Disability Report, signed on July 7, 2000, Plaintiff identified his medications as Codeine and muscle relaxers prescribed by Dr. Boury, and Valium prescribed by Dr. Barbara Heller, and said the side effect he experienced was sleepiness from the Codeine. (R. 91). In a pain questionnaire signed on July 24, 2000, Plaintiff identified his pain medications as "Vicodin, Soma compound, Valium for muscle spasms, aspirin, motrin, [illegible], Ben Gay, Ibeprophin [sic]...."[4] (R. 103). In response to a question concerning whether the medication relieved the pain and for how long, Plaintiff stated: "couple of hours. It dulls pain, does not completely go away. It will change from a scale from 1-10 to at times to 4-5." (Id.). In response to a question about side effects from medications, Plaintiff said: "Makes me drowsy, so I lay down. Muscle relaxers have to take sparingly because of stomach upsets." (Id.). Plaintiff described his pain as "from a scale from 1-10, constant pain at 4, it will escalate when I do small tasks to a scale of 7-10." (Id.). He said the pain was worse when bending, and was brought on by "minor tasks, sitting, standing, walking, or playing for more than 15 minutes at a time." (Id.).

## F.    Examination by Dr. Velis for SSA (September 2000)

DDS arranged for Dr. Dean Velis to examine Plaintiff on September 1, 2000. (R. 206-10). During that examination, Plaintiff reported "low back pain prior to 1997 when he underwent major back surgery." (Id.). He said he "was never sent for rehabilitation," and suffered from chronic and persistent back pain and spasms. (Id.). Dr. Velis's exam did not

---

[4]     It is unclear who prescribed these drugs. As previously noted, Dr. Boury's records show only a single prescription for Codeine in June 1998 that could not be refilled, and there is no record of any visits to physicians between June 29, 1998 and October 29, 2001 (except the exam by the DDS consultant in fall 2000). (R. 237, 253). It does not appear that Dr. Heller's records were included as part of the record, though Plaintiff's counsel informed the ALJ during both hearings that the medical records were complete. (R. 293, 409).

reveal any deformity or abnormal curvature, but he determined that Plaintiff's range of motion was limited in flexion to thirty degrees and in extension to ten degrees. (R. 207). A straight leg raising test was also positive in both legs at thirty degrees. (Id.). Dr. Velis concluded that Plaintiff was "in moderate distress with ambulation and mechanical motion of the lumbar spine," and noted "marked paravertebral muscle tenderness and spasms," as well as "occasional radicular symptoms radiating to the gluteal region." (R. 208). Focusing on the musculoskeletal system, Dr. Velis found that Plaintiff's finger grasp strength was 5/5, his hand grip was unimpaired bilaterally, and his "[a]bility to manipulate with both hands was normal." (R. 208).

Dr. Velis requested a radiological evaluation of the lumbosacral spine. This revealed post-surgical changes in the lower lumbar spine, including "minimal degenerative changes with occasional osteophytes at the vertebral endplates," slight sclerosis, and minimal narrowing at the L4-L5 and L5-S1 intervertebral spaces. (R. 211).

### G. Physical RFC Assessment (September 2000)

Also in September 2000, a Physical Residual Functional Capacity Assessment was completed by William Bucci, DCS, and approved by Dr. Bruce Donnelly. (R. 105, 212-19). Dr. Bucci found no motor loss or reflex abnormalities, and concluded that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand and walk or sit for six hours in an eight-hour day. (R. 213). Dr. Bucci also found that Plaintiff could occasionally climb, stoop, kneel, crouch, and crawl, but that he could never balance. (R. 214). Dr. Bucci determined that Plaintiff's range of motion was decreased to 30 degrees, and agreed that this pain had a medical basis. He concluded, however, that Plaintiff's "impairment does not meet or equal the level of severity described in the [Social

11

Security Regulations'] Listing of Impairment." (R. 219). In a separate document included in the record, Dr. Bucci opined that Plaintiff "cannot return to his past work or transfer skills." (R. 105). He further concluded that, based on Plaintiff's RFC, he could be expected to perform occupations that require "light work activity" including in the meat processing, bakery products, and rubber goods industry. (Id.). Dr. Bucci cited census data showing the number of people employed in these industries. (Id.).

Approximately one month after this physical RFC assessment, SSA denied Plaintiff's disability claim on the ground that he had the ability to perform light work. In the denial letter dated October 5, 2000, SSA stated that Plaintiff could reapply if his condition worsened and kept him from working. (R. 40-43). Plaintiff did not appeal the decision so no hearing was held before an ALJ.

## H.    Examination by Dr. Craig Anderson (October 2001)

The only doctor Plaintiff appears to have seen in 2001 is Dr. Craig Anderson, who was consulted for back pain on October 29, 2001. (R. 237, 253). Plaintiff complained that he was unable to bend and loosen up. He informed Dr. Anderson that his medication regime included Ibuprofen as needed, a Soma Compound approximately three times a week, and Valium twice every other week, though Plaintiff said he had run out of Valium one month earlier.[5] (Id.). Dr. Anderson prescribed Valium, Ibuprofen, and Celebrex. (Id.). Two days later, Plaintiff called Dr. Anderson's office and reported that the Celebrex had not relieved his pain. (R. 254). Dr. Anderson then prescribed Vicodin. (Id.). Based on the

---

[5]    As was discussed previously (Note 4 supra), the medical records do not reflect any physician visits or orders between June 29, 1998 and October 29, 2001, so it is unclear who prescribed these medications. On remand, records of Plaintiff's prescriptions and any doctor visits during this period should be obtained to the extent that they exist.

12

available medical records, it does not appear that Dr. Anderson saw Plaintiff again after this for treatment of back problems or pain.[6]

## I.    Treatment by Dr. Blas (March 2002 to June 2002)

In March 2002, Plaintiff began regular visits to Dr. Blas at the Melrose Park Pain Management Center for treatment of low back pain, and saw him 19 times by June 2004. (R. 263-81). During the first visit on March 25, 2002, Dr. Blas wrote that Plaintiff was self-employed and complained of pain in his low back, buttocks and lower extremities, and said he was waking up with pain and going to bed with pain. (R. 251). Upon examination, the straight leg raising test indicated pain at 30 degrees extension. The ankle reflexes and knee jerk were depressed. (*Id.*). Dr. Blas diagnosed radiculitis at L4-L5, L5-S1 bilaterally, and post laminectomy syndrome. He informed Plaintiff that he "may need to have a RACZ adhesiolysis" procedure to remove scar tissue resulting from Plaintiff's laminectomy. (R. 250). Plaintiff said he "want[ed] to try a non-invasive treatment for now." (*Id.*). Therefore, Dr. Blas decided to begin a "[t]rial for 3 months" with pain medications before reevaluating whether to proceed with the RACZ procedure. (*Id.*). Dr. Blas prescribed Zanaflex and Oxycontin and recommended that Plaintiff return in two weeks for further evaluation. (*Id.*). When Plaintiff returned on April 4, 2002, he told Dr. Blas that the Oxycontin "gave him

---

[6]     When Plaintiff's counsel sent the medical records to SSA for inclusion as an exhibit, he indicated that Dr. Anderson's records were dated September 28, 1999 through October 6, 2003. (R. 237, 252-57). These records reflect: two visits in 1999 for bronchitis (R. 252); no visits in 2000 (the two record entries in 2000 reflect only that disability forms were received and "disability forms mailed back with a note from GD [believed to be Dr. Gina Drugas of the same practice] as [patient] not seen by her since 1-10-96 for a back pain" (R. 253); two record entries in October 2001 related to back pain that are discussed in the text of this opinion; a notation on December 19, 2002 about the receipt of disability papers and a comment that patient "needs [appointment] to fill out forms" (R. 254); a visit on January 2, 2003 (to complete the forms) (R. 254); and three visits in 2003 for treatment of ear problems and bronchitis. (R. 254, 256-57). At his hearing before the ALJ in October 2008, Plaintiff said Dr. Anderson was his "personal GP." (R. 418).

good pain relief but made him unable to work (sleepy)." (R. 249). He also complained that "he slept too much" with the Zanaflex. (*Id.*). Dr. Blas therefore switched Plaintiff to Percocet and Soma Compound. (*Id.*). When Plaintiff returned on May 6, 2002, he reported that he was "able to function somewhat." (R. 248).

During his next visit on June 3, 2002, Plaintiff reported that "he is able to work physically only at times," and "complain[ed] that he is no longer able to work full days w/ the job." Plaintiff said he "does not want any interventions because he has phobia of hospitals & needles." (R. 247). On June 26, 2002, Dr. Blas noted that Plaintiff's condition was "stable" and there were "no new issues." Dr. Blas wrote that the "plan" was "to continue w/ present management." (R. 246). After this, Plaintiff did not see Dr. Blas again until September 9, 2002. (R. 245). In the interim, Plaintiff filed a new disability claim.

## J.    Disability Report and SSA Interview (August 2002)

On July 29, 2002 (about eight weeks before his DLI of September 30, 2002 and one week before his 50th birthday), Plaintiff filed a second application for disability benefits, alleging the same disability and onset date as the first claim. (R. 75). On August 12, 2002, Plaintiff completed a Disability Report and was interviewed by SSA. (R. 106-24). In the report, Plaintiff stated that he had been doing engine repair work for four hours each day (five days per week) between June 1998 and June 2002. (R. 108). He also reported plowing snow "when they needed me only about 40 hours for the month [between January, 2002 and February, 2002]." (*Id.*). Plaintiff indicated that he had stopped working in his engine repair business on June 1, 2002 because he "was in too much pain, losing sleep because I have to change sleeping positions, wakes me up if sleeping in a position too

14

long. Also medication cannot function when taking Rxs (narcotics) oxycontin." (R. 107). He said he "constantly [has] pain all day when I take my medicines[.] I cannot function since it seems to relax me. I try to start my own business but finally this year I could not do it any more because of pain." (R. 114).

Plaintiff indicated that he was taking the following medications at that time: Soma Compound prescribed by Dr. Blas for "spasms" and with the side effect of "stomach pain"; Oxycontin prescribed by Dr. Blas for pain and with the side effect of "Dizzy – cannot drive, etc."; Valium prescribed by Dr. Anderson to help Plaintiff sleep when in pain and with the side effect of "sleepy"; and Zanaflex and Percocet prescribed by Dr. Blas for spasms and with the side effect of "sleepy."[7] (R. 112). The SSA interviewer wrote: "Despite a face-to-face interview, there were no degree of limitations observed related to the alleged disability. Claimant appeared and acted normal physically and mentally." (R. 123).

## K.    Treatment by Dr. Blas (September 2002 to January 2003)

During a visit with Dr. Blas on September 9, 2002, Plaintiff reported that the Percocet no longer gave him satisfactory relief, so Dr. Blas switched him to MS Contin and Soma. (R. 238, 245). Dr. Blas wrote that if Plaintiff got sleepy with the daytime dose, then he should modify the dose. (R. 245). Plaintiff said he felt "somewhat better" during a visit on December 2, 2002, though he reported that the pain was aggravated "whenever he plows snow..." (R. 244). Plaintiff had decreased the MS Contin to one tablet a day, but Dr. Blas added Valium at bedtime for sleep. (R. 283, 244). At the next visit on January 6,

---

[7]    The medical records of Dr. Blas indicate that he took Plaintiff off Oxycontin and Zanaflex four months earlier, on April 4, 2002, after a ten day trial. R. 249, 251. Dr. Blas did not prescribe Oxycontin again until October 2003. R. 268. Dr. Anderson's records do not reflect any treatment for back pain after October 29, 2001. See note 6 supra.

2003, Plaintiff said his back pain had been aggravated by the cold weather. He also reported "a new problem with the right elbow." (R. 243).

**L.    Work History Report and Activities of Daily Living Questionnaire (December 2002)**

On December 23, 2002, Plaintiff signed a "Work History Report" in which he indicated that he worked for an "Owner Operated" business engaged in snow plowing and small engine repair from April 1, 1996 until December 31, 2001. He reported working three hours each day (five days per week) at a rate of $65 per hour. (R. 132). Plaintiff indicated that he had plowed snow for nine hours in 2002 but could not do it anymore because of the pain. (R. 138).

Also on December 23, 2002, Plaintiff signed a form entitled "Activities of Daily Living Questionnaire for Physical Impairments." In this document, Plaintiff indicated that "his pain became so severe" that he "closed [the engine repair] business on 12/31/2001." (R. 127). Plaintiff noted that he was experiencing pain, fatigue and weakness from arthritis in his hands and back pain. (R. 125). The pain increased after driving 10-15 minutes, and he was unable to sit for at least two hours because of pain and spasms after 10-15 minutes in one position. (R. 126). Plaintiff said his son was assisting him by carrying bags, groceries, and baskets of laundry, taking out the trash, and doing yard work. (R. 125, 127). In addition, Plaintiff was avoiding reaching overhead or above waist level because this brought on immediate pain and back spasms. (*Id.*). Plaintiff indicated that after 10-15 minutes of standing, walking or balancing, he needed to rest his lower back and buttocks, and take prescribed narcotic medications. (R. 126).

At some point, Plaintiff also provided copies of three prescriptions from CVS Pharmacy, each bearing a stamp of March 24, 2003: MS Contin (30 mg tablet taken twice a day); Valium (10 mg tablet 3 times a day); and Carisoprodol Compound (3 tablets a day). Each of these medications was prescribed by Dr. Blas. (R. 128-30).

**M.    Physical RFC Assessment (March 2003)**

Plaintiff's claim for disability was denied in February 2003. As a result of his request for reconsideration, a second Physical RFC Assessment was conducted on March 12, 2003 by Dr. S. Latchmamsetty. (R. 229-36). Dr. Latchmamsetty determined that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and stand for about 6 hours in an 8-hour day, but could not sit without occasionally standing to relieve discomfort. (R. 230). Dr. Latchmamsetty also found that Plaintiff was able to climb, balance and kneel frequently, and stoop, crouch, and crawl occasionally. (R. 231). The doctor reported that Plaintiff had experienced a "recent exacerbation of pain," but that the evidence showed he was "responding to medication." (R. 230, 234.)

**N.    Treatment by Dr. Blas (March 2003 to June 2004)**

Plaintiff continued to see Dr. Blas on a regular basis in 2003 and through at least June 2004. During a visit on March 24, 2003, Plaintiff informed the doctor that he "was in a great deal of pain nowadays," and that his pain was "progressively getting worse." (R. 242). He again declined the RACZ procedure. By May 30, 2003, Plaintiff described his back pain as "incessant." (R. 241-42). Dr. Blas wrote on July 24, 2003 that the pain was only being "moderated" by the MS Contin. (R. 239-40).

17

In a typewritten report dated August 27, 2003, Dr. Blas summarized Plaintiff's treatment to date. (R. 238). He observed that, since Plaintiff's lumbar laminectomy in 1997, "he has never had a pain free state but continued to have persistent pains of the lower back and lower extremities." (Id.). Dr. Blas wrote that he had explained the choices of treatment: one was "adhesiolysis utilizing the Racz Technic with the Racz Catheter which is a non-operative approach," and the other was a non-invasive approach utilizing only pain medications. (Id.). Dr. Blas wrote that Plaintiff had declined "any form of interventional type of treatment and wants to take a trial with pain medications." (Id.).

Dr. Blas described the various medications that he had prescribed for Plaintiff, starting with Oxycontin and Zanaflex on March 25, 2002. (Id.). On April 4, 2002, he substituted Percocet and Soma because Plaintiff was "unable to work and stay alert with the Oxycontin." (Id.). Plaintiff "continued the Percocet but [was] still refusing any treatment (Racz)" in May and June 2002. There were no visits in July or August of 2002, but in September, 2002, Plaintiff complained that "he is not significantly relieved by the Percocet." Dr. Blas decided to try "M.S. Contin 60 mgs. I BID, Soma 1 tab BID," and on December 2, 2002, he "added Valium 10 mgs at bedtime." (Id.). Dr. Blas indicated that Plaintiff "has been maintained on this regimen since then and up to the present time. I see him approximately every other month...." (Id.). Dr. Blas wrote that his diagnosis included "radiculitis, chronic, and irritative L4-L5, L5-S1 bilateral secondary to epidural adhesions. Secondary diagnosis is Postlaminectomy Syndrome, lumbar." (Id.). In terms of Plaintiff's employment, Dr. Blas wrote that "[h]e is now self employed as a mechanic of small engines." (Id.).

18

On October 9, 2003, at Plaintiff's request, Dr. Blas prescribed Oxycontin, which the doctor had taken him off in April 2002 after a ten-day trial. (R. 268). Dr. Blas also prescribed Zoloft to help with feelings of depression. (*Id.*). Dr. Blas wrote on December 4, 2003 that Plaintiff was "stable with the medication" and could do chores, but was "unable to exert himself without pain." (R. 267).

On January 12, 2004, Plaintiff complained to Dr. Blas about pain, swelling, and a decreased range of motion in his elbow, so an X-ray was planned. (R. 266). Plaintiff returned to Dr. Blas on February 16, 2004, April 29, 2004, and June 11, 2004, and each time, Dr. Blas renewed his prescriptions for Oxycontin, Soma, Zoloft and Valium. (R. 263-65).

**O.    Treatment by Dr. Choi for Right Elbow (2004)**

On April 6, 2004, an X-ray of Plaintiff's right elbow revealed degenerative changes with joint space narrowing, hypertrophic changes and bony density on the lateral view. (R. 261, 285, 286). On April 21, 2004, Plaintiff saw Dr. Kellen Choi with Sportsmed/Wheaton Orthopaedics and complained of right elbow stiffness and decreased range of motion as well as pain. (R. 259-60; 283-84). Dr. Choi noted that "This has been ongoing for approximately one year, but has worsened over this period. He states that he is a former truck driver who is applying for disability." (R. 259). Dr. Choi noted that Plaintiff was in "no distress," but observed that he exhibited a weak grip, sensation of numbness and tingling, and hyperflexion localized to the radial three digits. (R. 259-60). After examination and review of X-rays, Dr. Choi's impression was osteoarthritis of the right elbow and median nerve neuropathy. (R. 260). His diagnosis was degenerative joint disease of the right elbow. (*Id.*). He recommended EMG studies and a consultation with another doctor, but

19

Plaintiff chose to defer treatment. (Id.). Dr. Choi indicated that Plaintiff's "activity can be as tolerated to exclude heavy lifting greater than 10-15 pounds or manual labor." (Id.). Dr. Choi directed Plaintiff to follow-up on an as needed basis. (Id.). He saw Plaintiff a second time on May 11, 2005, but Plaintiff once again declined an EMG. (R. 402-03).

When Plaintiff returned to Dr. Choi on September 12, 2007, the doctor again recommended an EMG and occupational therapy. (R. 403-04). Plaintiff declined the recommendations due to the cost. (R. 404).

**P.    Plaintiff's Testimony**

1.    Hearing in August 2004: Plaintiff appeared with counsel at a hearing before ALJ Mondi on August 19, 2004, almost two years after his DLI. (R. 289, 291). Counsel asked the ALJ to "reopen" the prior application (denied in October 2000) based on newly-submitted evidence, namely records from Dr. Blas for treatment of back pain beginning in March 2002, and records from Sportsmed/Wheaton Orthopaedics (Dr. Choi) beginning in April 2004 for a right elbow problem. (R. 295). Counsel also observed that Plaintiff had passed the age of 50 since the prior application so a different grid rule applied ("closely approaching advanced age"). (R. 295-96).

Plaintiff testified as follows during the hearing. After his back surgery (laminectomy) in 1997, he was unable to return to his engine repair work for almost six months. (R. 299-300). Even after he returned, "it just got to the point where I was in more pain than what it was worth. I literally had to crawl up the stairs at night after I got done with the work." (Id.). If he started working at nine in the morning, by noon he would have to choose between taking his medication and stopping work, or working in pain through the afternoon.

20

(R. 318). He did the repair work half days, sometimes five days a week and sometimes six, and he "had to take the medications more and more." (*Id.*). When asked why he waited until October 2000 to apply for benefits when he had the back operation in 1997, he said he wanted to work and support his family rather than ask for help. (R. 323).

Plaintiff said he stopped the engine repair work at the end of 2001 or 2002 because he could not operate machinery while on the medication. (R. 300, 317). When asked the most that he had "grossed" and "netted" in a month from this business, Plaintiff said he did not know because his wife would take care of the paperwork. (R. 300). His last work had been for True Green Land Care, plowing snow. He believed this was over a year before the August 2004 hearing but prior to 2003. "It was one winter, I did some snow work. ... Just a few times. My back was bothering me too much." When asked whether he had done any other snowplowing since 1997, he responded that he had not. (R. 299). He also said, however, that he had plowed snow during the winter for a "few years." (R. 326).

Plaintiff was taking the following medications as of the day of the hearing: Oxycontin, Celebrex, Valium, Soma Compound, and Naproxen. (R. 147, 308). When asked about side effects from these medications, Plaintiff responded that he had become "addicted" to Oxycontin, which he had been taking for almost two years. (R. 308-09, 314). He never took more than prescribed, but stated that the drug blurs his vision, makes it hard for him to walk, and reduces his concentration. (R. 308-09). Plaintiff feels "drunk" and like a zombie when taking Oxycontin, and does not trust himself to drive or to be around machinery. (R. 309, 313, 316-17). As Plaintiff explained, "That's why I quit doing the lawn mowers. I like my fingers right where they're at." (R. 317).

21

Plaintiff testified that when he takes Oxycontin with Valium, he sometimes sleeps during the day, usually for two or three hours. (R. 321-22). Plaintiff was taking the Oxycontin daily and taking Valium as needed, which usually was three or four (or more) times a week. (R. 321). But his physician started him on "something new" -- Soma and Soma Compound -- that was "working a little better...." (R. 314). In addition to his medication, Plaintiff said he relieves the pain by laying on a couch or on an angle, or by sleeping. (R. 319).

On the day of the hearing, Plaintiff's back was hurting "big time" and he no longer could bend at the waist. (R. 305, 319). Additionally, his elbow had gotten progressively worse over the preceding two years. (R. 319). He could not extend his arm down, and he had lost substantial strength in his right hand and could not hold things with it. (Id.). Dr. Choi had told him not to use it. (R. 305-06). Plaintiff's only other medical problem was that Dr. Blas diagnosed him with depression and prescribed Paxil or some other similar drug. (R. 307). His pain level was "about eight and a half," and he described it as a constant seven on a scale from one to ten, ranging upwards at times to ten. (R. 313).

Plaintiff testified that he "couldn't walk two blocks" and shopped for groceries using Peapod. (R. 307). He was, however, able to drive a car, go to the store alone, and cut the grass with a riding mower. (R. 311-13). Plaintiff stated that he might be able to walk a block but would start getting spasms. He also gets spasms with sitting, but less so with the medication. (R. 323). When asked how long he could stand or sit at one time, Plaintiff said that it depended on the medication and the day but he could stand longer when taking medication. (R. 307, 326-27). Plaintiff did not believe he could sit for an eight-hour day,

even if he had the option of standing whenever needed. (R. 327). He also did not believe that he could stand or walk for two hours out of an eight-hour day. (Id.).

Plaintiff said his doctor (Dr. Blas) told him the pain was caused by "scar tissue built up," and wanted "to go back in and remove all the scar tissue" (i.e., perform a RACZ procedure). (R. 315). Plaintiff declined the procedure since he did not want to be "opened up again" and Dr. Blas said there would be a six-month recovery period. In addition, the procedure would have to be repeated again in seven years since scar tissue would continue building up. (R. 315-16). Plaintiff did not volunteer any other reasons for declining the procedure, such as lack of health insurance.

2. <u>Hearing in October 2008</u>: Plaintiff (now 56 years old) appeared with different counsel at the second (post-remand) hearing before ALJ Mondi on October 7, 2008. He once again explained his reasons for declining the RACZ procedure: Dr. Blas predicted a six-month recovery period, there were no guarantees, and the procedure carried the same risks as the first surgery since they would open him up again. (R. 418-19). Plaintiff also offered an additional reason: he had no health insurance so was required to pay Dr. Blas out of pocket. (R. 419-20). When asked when he last had health insurance, Plaintiff said: "I believe it was 2000, sir. I'm not positive, but it was like 2000, 2001. I'm not exactly sure. .... She, she cancelled my insurance on me. It was through my wife." (R. 413). Plaintiff later testified that he had separated from his wife in 2001 (R. 425), and they divorced in 2003. (R. 412-13). Plaintiff was not asked why he had testified during the August 2004 hearing that he was then married and living with his wife.[8] (R. 297, 311). Nor was he

---

[8]     It also appears that Plaintiff was still living with this wife when he began seeing Dr. Blas in March 2002. Judith DeMarco was identified as Plaintiff's wife (with the same address as

23

asked about a letter from the BlueCross BlueShield Federal Employee Program to Ronald Demarco dated June 11, 2004, indicating that he was a "Service Benefit Plan Member" and approving his "Prior Approval" request for a 90-day supply of Celebrex. (R. 149).

With respect to employment, Plaintiff said he was unable to continue working as a snow plower because "the pain kept increasing and increasing, and [he] couldn't take any medication, because [he] was driving." (R. 413-14). He said he closed his engine repair business in 2002 because "the pain just kept getting worse and worse" and he required "more and more medication." (R. 414). This caused Plaintiff to "fall further behind with, with the work, because [he] couldn't . . . stand there, and couldn't work on the stuff, so [he] finally had to close [the business] down." (Id.). When asked whether something in particular had happened in July 2002 to cause him to apply for disability benefits again, Plaintiff said "I tried...the business, and it just didn't work." (R. 415). As for his typical monthly earnings from the business, Plaintiff said "at the end of the year, it was always a loss, the three years we were running it." (Id.).

On the day of the hearing, Plaintiff had shooting pain down his legs, "through [his] buttocks, down [his] leg," and his back was "starting to tighten up." (R. 423-24). Plaintiff said his condition "progressively gets worse." (R. 423). Driving to the hearing had aggravated his condition and then he "sat and talked a while, and it just, it just aggravated it." (Id.). Plaintiff did not take any pain medication before the hearing because he had to drive. (R. 425). Even simple activities like tying his shoe or doing dishes or laundry cause pain an hour or two later. (R. 426). The medications most successful in relieving his pain

him) in the Disability Report signed by Plaintiff on August 12, 2002. (R. 106, 115).

are the ones that he currently takes: Oxycontin, Valium, Soma, and Soma Compound. (R. 420). At one time he was taking MS Contin, but the medicine did not take the pain away unless taken with Valium and Soma, which turned him into a zombie, made him unable to function or concentrate and left him just wanting to sleep. (R. 420-21). Plaintiff reported taking this combination of drugs three to four times (or more) a week on average. (R. 421).

When Plaintiff switched to Oxycontin, he "was able to function better." Nevertheless, he affirmed his previous testimony (at the first hearing) that Oxycontin makes him feel like a zombie, and that he needs to lie down and sleeps off and on during the day when he takes it. (R. 422).

## Q. Vocational Experts' Testimony

1.    VE Breen (2004 Hearing):  John Breen ("VE Breen") testified as a vocational expert at the first hearing. (R. 328-46).  VE Breen found that Plaintiff's previous employment ranged from skilled labor to semi-skilled. (R. 328-29). The ALJ asked VE Breen to consider a hypothetical person with Plaintiff's work experience, education, and RFC as assessed by Dr. Latchmamsetty in 2003. (R. 330). VE Breen opined that the hypothetical person could perform Plaintiff's past relevant work, including the job of small engine mechanic, truck driver (pulling over and standing as needed), and snow plow operator. (R. 331-33). The VE concluded that, if that same hypothetical person had the RFC described in Dr. Bucci's September 26, 2000 report, including "an ability to do the lifting and carrying of no more than light work," he would be unable to perform Plaintiff's past relevant work. (R. 333). However, VE Breen opined that, if restricted to light work, the hypothetical person could work in a wide range of unskilled light work positions, including fast food worker, surveillance system monitor, security guard, or greeter. (R.

25

333-34). VE Breen estimated that in the Chicago metropolitan area, there were about 37,000 fast food jobs, 5,000 positions as a surveillance system monitor or security guard, and 3,000 positions as a host or greeter. (Id.).

According to VE Breen, if Plaintiff's testimony regarding his functional limitations were fully credited, the hypothetical person would be "unemployable based on those findings of less than sedentary." (R. 334-35). The VE summarized Plaintiff's testimony concerning these limitations as:

> could walk only about one block, the sitting and standing varies but, after taking his medications, he must sit down, become zombie-like, with zero concentration, has a limited use of his right arm, cannot bend at the waist, cannot reach with his right hand and sleeps during the day, approximately three to four times a week, pain in both legs. His pain is a constant seven and, at times, reaches up to a nine and close to a 10.

(R. 335). The VE also acknowledged that, if a person were unable to maintain concentration through an eight-hour day, either because of pain or side effects of medication, he would be unemployable. (R. 340). Additionally, VE Breen agreed that a person who needed to alternate between sitting and standing to relieve discomfort would be unable to work in a light duty fast food job, though not necessarily in a job as a surveillance system monitor or greeter. (R. 341-42). The fast food job also required occasional bending, and the small engine mechanic and truck driver jobs required frequent bending. (R. 345). If the hypothetical person could not meet those bending requirements, he would be unable to perform those jobs. (R. 345-46).

2.    VE Gusloff (2008 Hearing):  At the second hearing on October 7, 2008, vocational expert Thomas Gusloff ("VE Gusloff") testified that Plaintiff's prior experience ranged from the semi-skilled, such as truck driver, to the skilled, such as engine mechanic.

26

(R. 431). The ALJ asked VE Gusloff to consider a hypothetical person with Plaintiff's work experience and education as well as the same RFC as had been assessed in the first decision, namely, "the ability to [do] medium work, although subject to postural limitations against more than occasional stooping, crouching, or crawling, and also requiring the option to alternate between sitting and standing." (R. 432-33). VE Gusloff opined that the hypothetical person would be able to work as a delivery or truck driver or as a spotter. (R. 433). If the person were limited to performing light work with a need to alternate between standing and sitting every 30 minutes, then he could work in other positions using skills similar to those developed by Plaintiff as a mechanic, such as "assembly, disassembly, inspection and troubleshooting in the light area." (R. 433-34). These jobs included assembly inspector, electrical assembler, appliance assembler, or chauffeur. (R. 434-35).

VE Gusloff estimated that there were 13,150 inspector positions, 6,150 electronic assembly positions, 11,880 general assembler positions, and 4,330 chauffeur positions in the Chicagoland area. (*Id.*). With the additional restriction of limited use of the right arm, the hypothetical person could perform other jobs including messenger, counter clerk, or deliverer. (R. 435-36). VE Gusloff stated that there were 13,010 counter clerk positions, 25,160 deliverer positions, and 2,440 messenger positions in the Chicagoland area. (R. 436). The VE was asked whether, if the ALJ were to fully credit Plaintiff's testimony, the VE's opinion would change. VE Gusloff responded that "[t]otally crediting the testimony, especially in regards to the effects of medication, and its effect on his being sleepy and not functioning, I think I would preclude positions that he'd be, would be -- no positions would be possible." (R. 436).

27

On cross examination, VE Gusloff agreed that, in the long run, a person who required one unscheduled hour off each week may lose his position. (R. 437-38). He also opined that a person who required a two hour break in the middle of the workday may be able to maintain his job, depending on the position. (R. 438). The VE explained that certain jobs, such as working as a chauffeur, might allow an employee to add back time to the end of the workday. (*Id.*). However, "if it interrupts just completely. . . that's not going to work." (*Id.*). The VE also opined that "if the person had to avoid exposure to all machinery," the various assembly jobs would be unavailable. (R. 438-39).

Plaintiff's counsel asked VE Gusloff to identify positions that would be available to a person who had to "alternate sitting and standing as frequently as every 30 minutes." (R. 439). VE Gusloff replied that "jobs such as an inspector and with assembly oftentimes are set up where you can be seated or standing to complete the duties." (*Id.*). Some jobs, such as assembly inspector or electrical assembler, could accommodate a need to sit whenever necessary, but some other assembly jobs would become unavailable. (R. 440).

Plaintiff's counsel also asked whether driving or delivery jobs would allow a person to stand or sit in the middle of a delivery. (R. 442-43). VE Gusloff opined that both the driving and delivery jobs would allow the person opportunities to stand or sit during the day, depending on the frequency of the person's pain. (*Id.*). But a person could "probably not" stand while driving if their condition demanded it. (R. 442). If the hypothetical person could stand for ten minutes at most, VE Gusloff concluded that other sedentary positions were available, such as order clerk, atomizer assembler, surveillance system monitor, and security guard. (R. 443).

28

**R. The ALJ's Decision (October 2004)**

On October 25, 2004, ALJ Mondi denied Plaintiff's claim after finding that, as of the DLI of September 30, 2002, Plaintiff retained the residual functional capacity to perform a restricted range of medium work with the ability to alternate between sitting and standing and no more than occasional stooping, crouching, and crawling. (R. 33). The ALJ noted that, while Plaintiff had described daily activities that were "fairly limited," "two factors weigh against considering his allegations to be strong evidence in favor of a finding of disabled." (R. 32). The first was that the "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (*Id.*). The second was that "even if [Plaintiff's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (*Id.*). The ALJ then concluded: "Overall, [Plaintiff's] reported limited daily activities are considered to be outweighed by other factors discussed in this decision." (*Id.*).

In the remainder of the decision, the ALJ noted (in relevant part): (1) Plaintiff "engaged in part-time work activity after the alleged onset of disability extending well into 2003 ... [and] the activity reflects that [Plaintiff's] daily capabilities have, at least at times, been greater than he has generally reported"; (2) Plaintiff failed to follow-up on recommendations by the treating doctor... [and] instead [has] chosen to use potent narcotic medications even though he also indicates that they provide little relief and have incapacitating side effects"; (3) the DDS physicians gave conclusions as to Plaintiff's RFC that supported a finding of "not disabled"; and (4) no treating or examining physician had

opined that Plaintiff was disabled or imposed restrictions prior to the DLI of September 30, 2002. (R. 32-33).

## S.    Judicial Review and Remand (August 2007)

Plaintiff sought judicial review of ALJ Mondi's decision.  On August 16, 2007, Magistrate Judge Nolan concluded that a remand was necessary to address three issues. (R. 381-88).  First, in assessing Plaintiff's credibility, the ALJ had noted that Plaintiff declined to undergo the RACZ procedure, but the ALJ had omitted any mention of Plaintiff's stated reasons for doing so.  The court held that, on remand, "if the ALJ draws a negative inference from [Plaintiff's] failure to undergo the RACZ procedure, he must explain why he discredits [Plaintiff's] explanations that may explain the failure." *Demarco*, slip op., at 4.  Second, the ALJ "implicitly rejected [Plaintiff's] claim concerning severe and debilitating side effects from his medications" but did not provide his reasons. *Id.* at 4-5. On remand, the ALJ was directed to "specifically articulate his reasons for believing or not believing [Plaintiff's] testimony as to the side effects of his medications." *Id.* at 6-7.  Finally, the ALJ had impliedly rejected Plaintiff's allegations concerning limitations in his abilities to stand and concentrate and his need to sleep for long periods of time during the day, but the ALJ had not provided a narrative discussion as required by SSR 96-8p.  On remand, the ALJ was directed to include an explanation of whether Plaintiff's allegations regarding the limitations could or could not reasonably be accepted as consistent with the medical and other evidence. *Id.* at 7-8.

## T.    The ALJ's Second Decision (November 2008)

Following a second hearing, ALJ Mondi again found Plaintiff was not disabled in a decision dated November 4, 2008. As before, the ALJ concluded that Plaintiff's spinal problems following his laminectomy constituted a medically severe impairment but not one that met or equaled any listing set forth in Appendix 1, Subpart P, Regulations No. 4. (R. 353-54). The ALJ went on to determine Plaintiff's RFC, considering all of the impairments. He concluded that through at least the DLI of September 30, 2002, Plaintiff had the RFC to perform "medium work, as defined in 20 C.F.R. § 404.1567(c), not requiring more than frequent balancing, kneeling, or climbing, more than occasional stooping, crouching, or crawling; and subject to a need to be able to periodically alternate between sitting and standing to relieve low back pain." (R. 354).

In reaching this conclusion, the ALJ found that, while Plaintiff "clearly now has a severe right hand limitation," the "impairment did not become significantly limiting until well after his date last insured." (Plaintiff does not challenge this finding on appeal.)  The ALJ also concluded that, prior to the DLI, Plaintiff's "back symptoms and the side effects from his medications were not so severe as to preclude all work." (Id.). As is discussed later, the ALJ did not find Plaintiff's testimony about the intensity, persistence and limiting effects of his symptoms to be credible in establishing a disabling condition prior to September 30, 2002. (R. 355). In finding that Plaintiff could perform a restricted range of work during this period, the ALJ  adopted the conclusions reached by two DDS physicians as to Plaintiff's RFC through the date last insured since they "are consistent with the medical evidence and [Plaintiff's] activities." (R. 356-57). The ALJ added that no doctor had opined that Plaintiff was disabled on or before September 30, 2002, or even subsequently. (R. 357).

31

The ALJ also summarized the testimony of the VEs at the first and second hearings after which he concluded, "[c]onsistent with probative testimony from [the VEs,]" that Plaintiff was "capable of performing past relevant work as well as making a successful adjustment to work existing in significant numbers in the economy through at least the expiration of his insured status under the Act." (R. 359). Thus, the ALJ found that Plaintiff was not disabled under the Act. (Id.).

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. See 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Schmidt v. Astrue, 496 F.3d 833, 841 (7th Cir. 2007) (quoting Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009) (quoting Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly

articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover disability insurance benefits under the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008); *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

In support of his motion for summary judgment, Plaintiff argues that the ALJ erred in several respects. This Court addresses each argument in turn.

33

### 1. The Law of the Case Doctrine

Plaintiff first argues that ALJ Mondi erred by not complying with the law of the case doctrine requiring a court to "conform any further proceeding on remand to the principles set forth in the appellate opinion [here Judge Nolan's opinion remanding the case] unless there is compelling reason to depart." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). In her opinion, Judge Nolan stated: "Even though there may be enough evidence in the record to support the ALJ's apparent rejection of Plaintiff's alleged limitations..., the ALJ should have discussed his reasons for discounting Plaintiff's allegations" and why they "can or cannot reasonably be accepted as consistent with the medical and other evidence." *Demarco*, slip op., at 7-8. Plaintiff contends that ALJ Mondi has not complied with this directive. In Plaintiff's view, the ALJ "either rejected or ignored [Plaintiff's] allegations of his limitations in standing, concentrating and need for sleep during the day" since the RFC assessment "did not include these limitations." Yet the ALJ failed to explain why he rejected them. (Doc. 17, at 12).

This Court disagrees. After summarizing Plaintiff's testimony concerning his alleged limitations during both the initial and post-remand hearings, ALJ Mondi set forth in narrative fashion his reasons for finding Plaintiff not credible in describing the severity and limiting effects of his symptoms prior to September 30, 2002. (R. 356). He began with reasons for questioning Plaintiff's testimony concerning the timing of right hand and elbow problems given evidence that this impairment had not become significantly limiting until well after the DLI. (R. 355-56). Next the ALJ pointed out specific "inconsistencies and contradictions" in the record (discussed later in this opinion in relation to other arguments) that caused him to question Plaintiff's testimony concerning his alleged inability to work because of

34

medication side effects. (R. 356). Further, he described some of the activities that Plaintiff

had engaged in that the ALJ felt were not consistent with the claimed limitations. The ALJ

also said he was influenced by opinions from two state agency medical consultants who

opined that Plaintiff could perform a restricted range of work through his DLI, and the fact

that, in contrast, no treating physician had said Plaintiff was disabled prior to the DLI. (Id.).

In addition, ALJ Mondi said there was a lack of objective findings indicative of significant

back limitations until well after the DLI. (R. 357).

While Plaintiff may disagree with the ALJ's analysis (for reasons discussed later in

this opinion), there is no basis for overturning the ruling based on the law of the case

doctrine. Contrary to Plaintiff's assertions, the ALJ did provide a narrative discussion of

why he discounted Plaintiff's testimony about his alleged limitations in light of all the

evidence. It is not enough to say, as Plaintiff does, that the ALJ's discussion was a

"credibility analysis" and is not the same thing as (nor a substitute for) the required

narrative discussion under SSR 96-8p.[9] (Doc. 17, at 13). Regardless of how one chooses

to characterize the ALJ's discussion, the pertinent question is whether the ALJ followed

Judge Nolan's instructions and set forth reasons for his conclusion concerning Plaintiff's

functional limitations. Because he did so, the Court rejects Plaintiff's argument that the

ALJ violated the law of the case under the circumstances presented here.

## 2.    The ALJ's Credibility Determination

Plaintiff next argues that the ALJ failed to properly analyze his credibility under SSR

96-7p. (Doc. 17, at 13). In assessing a claimant's credibility when the allegedly disabling

---

[9]      Plaintiff relies on *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996) for this
proposition but the case does not reflect such a holding.

symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila*, 573 F.3d at 517 (quoting SSR 96-7p). The ALJ should look to a number of factors to determine credibility, including "the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Id.* (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

"Appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is highly limited because the reviewing court lacks direct access to the witnesses..., lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Fairman v. Anderson*, 188 F.3d 635, 647 (5th Cir. 1999)). This Court will overturn a credibility determination only if it is "patently wrong." *Craft*, 539 F.3d at 678. At the same time, an ALJ's decision cannot be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Shramek*, 226 F.3d at 811 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). Plaintiff contends that a logical bridge is

missing here because ALJ Mondi relied on several "improper" bases in finding him not credible. (Doc. 17, at 13). This Court examines these in turn.

        **a.**    <u>**Objective Evidence**</u>: ALJ Mondi found that, while Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, his statements concerning the intensity, persistence and limiting effects of the symptoms, when compared to the objective evidence and evaluated using factors in SSR 96-7p, were not credible in establishing a disabling condition on or prior to the DLI of September 30, 2002. (R. 355). Plaintiff challenges this credibility finding insofar as it was based (in part) on a purported lack of objective evidence supporting Plaintiff's testimony about his symptoms. Plaintiff summarizes at length what he believes to be significant objective evidence corroborating his testimony. (Doc. 22, at 7-8). The Commissioner, in turn, defends the ALJ's analysis by observing that there were "sparse medical records before [Plaintiff's] insured status expired; and those few records that do exist document [Plaintiff's] allegations of pain, but little else." (Doc. 21, at 7).

This Court agrees with the Commissioner that the medical records are "sparse" -- at least for the bulk of the almost five-year period between the alleged onset of the disability (December 5, 1997) and the DLI (September 30, 2002). While there is ample medical evidence of Plaintiff's back impairment leading to the laminectomy on December 5, 1997, Plaintiff rarely sought medical treatment for back pain during the next four years. Indeed, based on medical records over this period, it appeared that the laminectomy was successful. Dr. Boury reported that during this procedure, he removed a herniated disk and was able to free the nerve root from any compression. (R. 166). When the doctor examined Plaintiff six months later, in June 1998, he observed that Plaintiff was "very

37

pleased with how things were going with the resolution of his bilateral buttock pain," and was "back to working in his garage repairing lawn mowers." (R. 194). In terms of ongoing problems, the doctor wrote only that Plaintiff "complains about occasional localized back pain which responds primarily to the use of some Tylenol with Codeine, and the purpose of his visit was to acquire some." (Id.). Dr. Boury gave Plaintiff a prescription for 25 tablets of this medication with "no refills" and indicated that he would see Plaintiff on an as needed ("PRN") basis. (Id.). Based on Dr. Boury's medical records, he did not see Plaintiff again after this or prescribe any further medications.

Nor are there medical records from any other physicians in 1998 reflecting that Plaintiff received treatment for back problems or pain that year. Similarly, there are no such records in 1999 or 2000. Indeed, the only physicians Plaintiff saw in 2000 were DDS consultants (in September 2000) as a result of his filing a disability claim. After those examinations, Plaintiff's disability claim was denied based on a finding that he was capable of light work, and Plaintiff did not appeal.[10] Another year passed after this without Plaintiff seeking treatment for his back or related pain.

It was not until October 29, 2001 that Plaintiff saw Dr. Craig Anderson, complaining of back pain. At that time, Plaintiff said his medication regime included Ibuprofen as needed, a SOMA compound approximately three times a week, and Valium twice every

---

[10]     Plaintiff indicated in his disability paperwork signed in July 2000 that he was taking Codeine and muscle relaxers (prescribed by Dr. Boury) and Valium (prescribed by Dr. Heller). As noted before, Dr. Boury's records show only a single prescription for Codeine in June 1998 that could not be refilled. Assuming Plaintiff saw Dr. Heller after the laminectomy, her treatment documents were not included as part of the record. Plaintiff's counsel, moreover, informed the ALJ during the 2004 and 2008 hearings that they were not aware of any other pertinent medical records that had not yet been produced. (R. 293, 409).

other week (though Plaintiff said he had run out of Valium the month before). (R. 253). It is unclear who prescribed these medications since, as noted before, the medical records do not reflect physician visits or prescriptions between June 29, 1998 and October 29, 2001. After examining Plaintiff, Dr. Anderson prescribed Valium, Ibuprofen and Celebrex; however, two days later, Plaintiff called the doctor and said the Celebrex was not relieving his pain so Dr. Anderson prescribed Vicodin. (R. 254). There are no records of any subsequent doctor visits or prescriptions in 2001. A couple of months later, in January 2002, Plaintiff reportedly plowed snow for 40 hours. (R. 108). He also reportedly continued operating his small engine repair business on a part-time basis. (*Id.*).

While Plaintiff filed a new application for disability benefits in July 2002, he did not submit any new medical records reflecting treatment or prescriptions for back pain during the preceding years. Instead, the new medical records related solely to treatment by Dr. Blas beginning on March 29, 2002. Those records are discussed in detail later in this opinion in relation to other arguments made by Plaintiff. Suffice it to say here that these records demonstrate that, at least during the last six months prior to the DLI, Plaintiff sought regular treatment for back pain. Dr. Blas concluded that the RACZ procedure and, in lieu of this, a trial with pain medications was medically indicated because of the build-up of scar tissue. (R. 238).

Contrary to Plaintiff's assertion, Dr. Blas did not opine that the medication side effects were so severe during the claimed disability period that Plaintiff was incapable of working. (Doc. 17, at 16) (faulting the ALJ for failing to consider the "treating physician's opinions that Plaintiff could not work due to side effects of medications."). The medical records referenced by Plaintiff (R. 238, 279) do not reflect such an opinion. Instead they

39

show only that, during the second visit to Dr. Blas (on April 4, 2002), Plaintiff reported that the Oxycontin prescribed on March 25, 2002 "gave him good pain relief but made him unable to work (sleepy)[,]" and that he "slept too much" while on Zanaflex. As a result, Dr. Blas took Plaintiff off these drugs and prescribed different ones. (R. 238, 279). Subsequent records of Dr. Blas also do not reflect any opinion that Plaintiff was unable to work prior to the DLI. Indeed, some of the records call into question Plaintiff's assertion that his symptoms were so severe that he only repaired engines on a part-time basis and stopped entirely by December 2001 (or June 2002).[11] (See R. 247) (June 3, 2002 entry of Dr. Blas states "he is able to work physically only at times," and "complains that he is no longer able to work full days w/ the job.") (See also R. 238) (August 27, 2003 report of Dr. Blas states Plaintiff "is now self employed as a mechanic of small engines.").

Based on this Court's review of all the medical records, it concludes that ALJ Mondi did not err in basing his credibility finding, in part, on a lack of objective evidence supporting Plaintiff's testimony about the severity and limiting effects of his symptom between December 5, 1997 and September 30, 2002.

**b.    Consideration of Plaintiff's Testimony**: Plaintiff next contends that the ALJ failed to properly analyze his credibility under SSR 96-7p because he mischaracterized or ignored certain aspects of Plaintiff's testimony. (Doc. 17, at 15). In Plaintiff's view, the ALJ did not discuss the "full scope" of his testimony, which undermines

---

[11]    Plaintiff sometimes said he ceased engine repair work in December 2001 (see e.g., R. 131; Work History Report dated 12/23/02), but other times said he stopped in June 2002 (see e.g., R. 108; Disability Report dated 8/12/02).

the underlying rationale for finding Plaintiff not credible. (*Id.* at 16). The Court rejects this argument except in one limited respect.

Before turning to the specific testimony upon which Plaintiff relies, it is helpful to summarize the pertinent discussion in the ALJ's credibility analysis. In his decision, ALJ Mondi acknowledged Plaintiff's testimony that "he is unable to function when taking narcotic medications...and that his medications (which include Oxycontin) caused blurred vision, poor concentration, and made him 'a zombie.'" (R. 356). The ALJ then highlighted evidence that he felt was inconsistent with the claim that these symptoms rendered Plaintiff disabled between December 5, 1997 and September 30, 2002. Specifically, the ALJ noted that medications had not prevented Plaintiff from (1) performing a light duty job starting in 1995; (2) engaging in self-employment as a mechanic for many years starting in 1996 and continuing until 2001 or 2002 or even until at least August 2003; and (3) engaging in activities like driving a car, plowing snow a few times, and cutting grass on a riding mower. (R. 356). Such "inconsistencies and contradictions" were one factor that led ALJ Mondi to conclude that Plaintiff's back symptoms and side effects from medications "were not so severe as to preclude all work." (R. 356).

Plaintiff asserts that the ALJ's findings ignored his testimony that he was unable to drive a car or plow snow while on medications and stopped working as a mechanic specifically because he could not keep up with the work due to increasing pain and side effects from more and more medications. (Doc. 17, at 13-16). The Court examines specific testimony relating to these topics below.

     **i.**  **Snow Plowing**: Plaintiff argues that the ALJ "grossly mischaracterized" his testimony when he made a finding that medications had not

41

precluded him from "plowing snow." (Doc. 17, at 15). As an initial matter, Plaintiff misstates the ALJ's finding, which was that Plaintiff's medications did not preclude him from plowing snow "a few times" prior to September 30, 2002. (R. 356) (quoting Plaintiff's testimony). Examination of the referenced portion of Plaintiff's testimony reveals that it is not inconsistent with the ALJ's finding. What Plaintiff testified was that the "last work" he had done was an attempt to "try to do some snow plowing" and he believed this was in 2003. (R. 413). Plaintiff said he only went out two or three times for a couple of hours and kept having to pull over and get out of the truck because of increasing pain and an inability to take medication while driving. (R. 413-14). Such testimony about a couple of unsuccessful efforts to plow snow in 2003 does not contradict the ALJ's finding that, prior to September 30, 2002, Plaintiff engaged in snow plowing a few times. For example, Plaintiff said in a Disability Report that he plowed snow for approximately 40 hours in January 2002. (R. 108). While Plaintiff may have been taking medications at various times prior to September 30, 2002, the ALJ's finding that Plaintiff nonetheless plowed snow occasionally was not erroneous.

**ii.** **Testimony Concerning Impact of Oxycontin**: Similarly, the testimony that Plaintiff references concerning his inability to work because of medication side effects was not as broad as he now suggests.[12] What Plaintiff actually said during the referenced portions of the 2004 hearing is that, at the time of the hearing, he was taking Oxycontin and this particular medication made him feel like he was "drunk" and that

---

[12]    Plaintiff references page 385 of the record which is a page from Judge Nolan's opinion remanding the case. In this page of the opinion, Judge Nolan referenced certain portions of Plaintiff's testimony during the 2004 hearing where he discussed the side effects of the medications that he was taking at the time. *Demarco*, slip op., at 4 (citing R. 308-09, 317, 320-22).

he was unable to drive or work on lawn mowers while on it. (R. 308-09, 316-17, 320-22). Such testimony about side effects Plaintiff was experiencing in 2004 was not inconsistent with the ALJ's finding that medication side effects had not prevented Plaintiff from working several years prior to September 30, 2002.

Moreover, review of the medical records reveals that Plaintiff first took Oxycontin in late March 2002 but only for a period of about ten days at which point Dr. Blas substituted other drugs because Oxycontin gave good pain relief but "made him unable to work (sleepy)." (R. 249-50). In other words, Plaintiff was taken off Oxycontin precisely because it prevented him from working. It was not until October 9, 2003 (almost a year after the DLI) that Dr. Blas again prescribed Oxycontin when Plaintiff specifically requested this drug. (R. 268).

When he testified during the 2008 hearing, Plaintiff had a somewhat different recollection of which medications resulted in the most severe side effects. In this regard, Plaintiff said he went back on Oxycontin (in October 2003) because the drug that he was on at the time, MS Contin, only relieved the pain when taken together with Valium and Soma, but "when I took all three of them, the MS Contin, and the Valium, and the Soma, that's when it took the pain away; but it was -- I turned into a zombie...." (R. 420). Plaintiff testified that, when he was switched to the Oxycontin, he "was able to function better." (R. 422). When Plaintiff's counsel reminded him of his prior testimony (at the 2004 hearing) that the Oxycontin made him feel like a "zombie," Plaintiff agreed that it did. (Id.). The medical records indicate that Dr. Blas first prescribed MS Contin and Soma on September 9, 2002. (R. 238, 244). And it was not until December 2002 that the doctor also added Valium to be taken at bedtime. (R. 238, 245). Thus, it appears that between December 5,

43

1997 and September 30, 2002, Plaintiff was not taking the combination of medications that he recalled having the severe side effects.

Based on its review of Plaintiff's testimony and Dr. Blas's records, this Court finds no error in the ALJ's determination that over the almost five-year period of the claimed disability up until the DLI, Plaintiff worked, drove a car and plowed snow at times even though he reportedly was taking medications for back pain. Nonetheless, as the Court intends to remand the case on other grounds discussed below, Plaintiff should be permitted to highlight or supplement the existing medical and prescription records to the extent that they reflect his receiving treatment such as pain medication prior to September 30, 2002, and particularly the medications with the severe side effects (Oxycontin or MS Contin in conjunction with Soma and Valium).[13]

**iii.    Closing of Engine Repair Business**: Plaintiff also argues that the ALJ's finding about Plaintiff working while on medications for several years ignored testimony that he was unable to keep up with the work because of pain and medication side effects and so had to close his engine repair business. (Doc. 17, at 14). Again the testimony that Plaintiff references is not inconsistent with the ALJ's finding. It is undisputed that Plaintiff operated an engine repair business on a part-time basis for a number of years during the almost five-year period when he allegedly was disabled. Even crediting his testimony that his condition (and the side effects) eventually grew so bad that he was

---

[13]    In a "Prehearing Notice" dated May 24, 2004, Plaintiff was asked to submit (among other items) all medical records from any treating doctors not identified on an enclosed exhibit list, and to complete certain questionnaires. (R. 145). In response, Plaintiff completed and signed a document identifying his current medications. (R. 147). In that document, Plaintiff said he was taking Oxycontin (20 mg) twice a day for back pain and that this drug had first been prescribed in 2001. (Id.). As discussed previously, the existing medical records do not support this statement.

incapable of working at all, this is not inconsistent with the ALJ's finding that he worked for several years while reportedly taking medications.

It is worth noting that the record is unclear concerning *when* Plaintiff allegedly ceased working entirely because of his need to take more pain medications with side effects that left him unable to function. In certain disability documents, he said he reached this point by the end of 2001. (R. 127) ("[I] continued business until pain became so severe, closed business on 12/31/2001."). In other disability documents, he indicated that he closed his business in June 2002. (R. 107) (indicating that he stopped working on "6/1/2002" because "was in too much pain, losing sleep because I have to change sleeping positions, wakes me up, if sleeping in a position too long. also medication cannot function when taking RX's (narcotics) Oxycontin."). But when Plaintiff saw Dr. Blas on June 3, 2002, he indicated that he was still working but no longer on a full-time basis. R. 247 ("He is able to work physically only at times. He complains that he is no longer able to work full days w/ the job."). It does not appear that Plaintiff ever subsequently informed Dr. Blas that he had ceased working entirely since none of the treatment records reflect such a statement and the doctor's summary report of August 23, 2003 states: "Plaintiff is now self employed as a mechanic of small engines."[14]  (R. 238).

---

[14]     Plaintiff asserts that Dr. Blas was mistaken about his employment status in 2003 and faults the ALJ for relying upon this record without seeking "clarification" from Dr. Blas or allowing Plaintiff to "address the perceived inconsistency." (Doc. 17, at 15). He contends that this should have been done given Plaintiff's "work summary report" (generated by SSA) showing no earnings in 2003. (*Id.*). The work summary report, however, also shows no earnings in earlier years when Plaintiff admittedly was working. (R. 398). Nonetheless, on remand, Plaintiff should be permitted to supplement the record with additional evidence concerning when he ceased working, including any clarification from Dr. Blas.

By the time of the 2004 hearing before the ALJ, Plaintiff said he could not remember exactly when he stopped repairing engines but it was in 2001 or 2002, and "in January, the end of the year. When the year started, I just stopped." (R. 300). But in that same hearing, Plaintiff also tied the closing of the repair business to when he began taking Oxycontin, testifying that he "quit doing the lawn mowers" for fear that he would lose a finger since this drug interfered with his concentration. (R. 317). As noted previously, the medical records of Dr. Blas indicate that Plaintiff first took Oxycontin in March 2002 but only for a ten-day period. He did not resume use of this drug until October 2003. (R. 249-50, 268).

During the 2008 hearing, Plaintiff testified that he believed he closed the engine repair business in 2002. (R. 414). When asked how long he had operated it, he said: "It was a couple of years I worked, I tried. And the pain just kept getting worse and worse. I was taking more and more medication. And I was falling further behind with, with the work, because I couldn't you know, couldn't stand there, and couldn't work on the stuff, so I finally had to close it down." (*Id.*). When asked how much he had earned from the business in a typical month, Plaintiff said he couldn't say but "it was always a loss, the three years we were running it." (R. 415). In certain disability documents, Plaintiff indicated that he had operated the engine repair business for four years (from June 1998 through June 2002). (R. 108). In other documents, he said the business was in operation for almost six years (from April 1, 1996 through December 31, 2001). (R. 131).[15]

---

[15]     Earnings from the business were set forth in a document signed by Plaintiff on November 27, 2002 in which he said he "had losses in self-employment for 2000 and 2001." (R. 77). Plaintiff's tax returns reflect gross receipts from a business called "Lawn Mower Doctor" in 1999 ($6,352), 2000 ($9,627), and 2001 ($11,288). (R. 69, 78, 80). After depreciation and other

Regardless, Plaintiff's testimony that he eventually stopped working was not inconsistent with the ALJ's finding that Plaintiff worked a number of years while on medication prior to this.

This Court does, however, agree that the ALJ's decision mischaracterized Plaintiff's testimony concerning his reasons for closing the engine repair business. The decision said Plaintiff testified during the 2008 hearing that he re-applied for benefits "after he realized that his one-man business wasn't going to make it, not that he couldn't do the work which he had started doing in 1996[.]" (R. 356). In fact, Plaintiff testified that his symptoms prevented him from keeping up with the work and this was the reason that he closed his business. (R. 414). After this testimony, Plaintiff was asked whether something in particular had happened in July 2002 to cause him to apply for disability benefits again (following denial of the prior application in 2000) and he responded: "I tried...the business, and it just didn't work." (R. 415). While the ALJ was not required to credit Plaintiff's testimony that he closed the business because he no longer was able to perform the work due to his symptoms, it was error for the ALJ to rely on a misstatement of Plaintiff's testimony concerning his motivation for closing the business. On remand, the ALJ must assess Plaintiff's credibility without relying on this misstatement of his testimony.

---

expenses, the net profit (loss) was $3,202 in 1999, ($6,285) in 2000, and 0 in 2001. (Id.). The record does not contain tax returns for other years; however, it does contain a report of FICA and self-employment earnings that reflects $2,958 in earnings in 1999 and no earnings in years 1998, 2000 and subsequent years. (R. 82-84). When Plaintiff completed a disability report in August 2002, the SSA interviewer wrote that Plaintiff's net earnings were low enough (some years the business lost money) that he was found not to have engaged in substantial gainful activity. (R. 119, 124).

**iv.** **Reliance on Ability to Work**: Plaintiff also complains more generally about the ALJ's reliance on "the fact that [he] was able to sustain work for a period of time" and argues that this fact "does not necessarily direct a finding of not disabled." (Doc. 17, at 14). True, but ALJ Mondi did not find Plaintiff to be not disabled based solely on his work history. Instead, the ALJ considered the work history as one of several factors when evaluating Plaintiff's credibility in describing the severity and limiting effects of his symptoms. While employment is "not proof positive of ability to work," *Wilder*, 153 F.3d at 801, the ALJ was entitled to "consider all of the evidence presented, including information about [Plaintiff's] prior work record" in evaluating the symptoms and their impact. 20 C.F.R. § 404.1529(c)(3). As Plaintiff himself observes "ALJs are specifically instructed that credibility determinations should take account of 'prior work record. *SSR* 996-7p, 61 Fed.Reg. 34,483, at 34,486 (1996).'" (Doc. 17, at 15).

Plaintiff nonetheless objects that his continued efforts to work through 2002 "should have been a fact that enhanced rather than detracted from [his] credibility." (*Id.*). The Court disagrees. ALJ Mondi correctly observed that Plaintiff had engaged for several years in self-employment as a mechanic despite reportedly being on medication that rendered him unable to work. (R. 356). His determination that such employment was inconsistent with Plaintiff's allegations of disabling symptoms is not patently wrong. Nor did the ALJ err in "fail[ing] to consider [Plaintiff's] outstanding work history in his credibility determination." (Doc. 17, at 15). The Seventh Circuit has noted that a claimant "is not entitled to a presumption of credibility based solely on his long work history." *Jones v. Apfel*, 234 F.3d 1273 (Table), at *2 (7th Cir. 2000). Here, the ALJ fairly concluded that Plaintiff's work

history after the alleged disability onset date did not support his testimony regarding the limiting effects of his symptoms. The Court sees no error in the ALJ's consideration of Plaintiff's employment history.

Plaintiff also argues (in his reply) that his "work did not reach the substantial gainful activity level, thus indicating that [Plaintiff] was working on a less than full-time basis." (Doc. 22, at 7). Of course, low reported earnings from a home business do not necessarily mean Plaintiff was working less than full-time; there are a variety of possible alternative explanations. Even if it did, the pertinent question is not simply whether Plaintiff was working less than full-time but why: was he unable to work full-time during the almost five years in question because of the severity of his back pain and medication side effects? While Plaintiff claimed that his symptoms were so severe that he was disabled during this entire period, ALJ Mondi was not required to credit such testimony in light of all the other evidence in the record that he appropriately considered and that called Plaintiff's credibility into question. "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an [ALJ] is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). An ALJ's "finding [that a claimant exaggerated her physical limitation is] a well-nigh unreviewable determination of credibility." *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004).

For all of these reasons, this Court rejects the argument that the ALJ's credibility analysis improperly ignored, mischaracterized or drew the wrong conclusions from Plaintiff's testimony, except in one respect: the ALJ misstated Plaintiff's testimony concerning his reasons for closing the engine repair business. Because of this mistake,

49

as well as an error discussed below concerning VE Gusloff's testimony, the case must be remanded for further consideration. On remand, the ALJ will have an opportunity to consider whether he would have reached a different outcome had he been cognizant of the correct testimony on the particular subjects. In addition, Plaintiff will have an opportunity to present additional evidence concerning: (a) medications and other treatment between December 5, 1997 and September 30, 2002; (b) the date when he closed his engine repair business; and (c) apparent inconsistencies in the record concerning whether he lacked health insurance or not (discussed at pages 23-24 *supra*).

### 3. The VE's Testimony

Plaintiff next challenges the ALJ's reliance on VE Gusloff's testimony. He first objects that ALJ Mondi misstated one of the VE's primary conclusions. Specifically, the ALJ found that "the vocational expert testified that even if [Plaintiff's] testimony were credible, jobs could still be identified that an individual having those limitations and claimant's vocational factors could perform." (R. 357). As Plaintiff points out on appeal, however, the VE actually said the opposite during the October 7, 2008 hearing. VE Gusloff testified: "Totally crediting the testimony, especially in regards to the effects of medication, and its effect on his being sleepy and not functioning ... no positions would be possible." (R. 436). This error by the ALJ requires remand since it is at least possible that the ALJ would have reached a different decision had he correctly understood the VE's opinion. *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) ("[I]t is not that the error requires a different finding; rather, the ALJ's basis for his credibility determination on this issue is

50

wrong, and so the ALJ must reconsider the credibility determination in light of the evidence.").[16]

Plaintiff also claims that two of the VE's conclusions are unreliable and cannot support the ALJ's decision. As the Seventh Circuit has explained, "'[a] finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.'" *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)).

Plaintiff first contends that the ALJ should not have credited VE Gusloff's testimony that he could perform his past work as a truck driver despite the added limitation of being unable to sit for extended periods of time. In Plaintiff's view, such testimony was "illogical" given the obvious fact that one cannot stand while driving. (Doc. 17, at 17). Here, VE Gusloff opined that in many driving jobs "there are going to be opportunities throughout the day, depending on where you're stopping. . . that you're going to be standing and walking." (R. 442). This does not suggest that the VE assumed Plaintiff could stand while driving. Notably, VE Gusloff explicitly discounted long "over-the-road" driving jobs. (*Id.*). He further noted that depending on the severity of the person's condition, if he had to stand too often, those jobs would not be available. (*Id.*). Read in its entirety, there is nothing illogical about VE Gusloff's testimony.

Next, Plaintiff argues that the ALJ failed to resolve unidentified conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). Plaintiff argues that SSR

---

[16]    The Commissioner's brief inexplicably omits any mention of this alleged error and whether the error necessitates a remand.

00-4p required that the ALJ ask the VE if his testimony conflicted with the DOT. In support, he cites *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006), in which the Seventh Circuit held that an ALJ has an "*affirmative responsibility* to ask about any possible conflict between th[e] VE . . . evidence and information provided in the DOT." *Id.* at 735 (quoting SSR 00-4p) (emphasis in original). Here, the ALJ did not directly ask VE Gusloff if his testimony conflicted with the DOT. However, VE Gusloff cited DOT titles for every job he referenced, as well as the jobs' necessary strength and specific vocational preparation levels. It would be redundant to force the ALJ to ask a VE if job information drawn from the DOT was consistent with that same DOT.

Moreover, the alleged error is harmless unless there is actually a conflict between the VE's testimony and the DOT. *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (ALJ's failure to ask VE whether his testimony conflicted with the DOT was harmless because Plaintiff did not show that she could not perform the skills required for the jobs under the DOT). Plaintiff argues that because he must periodically alternate sitting and standing, VE Gusloff's testimony about available jobs in the light and medium range conflicted with the DOT. Specifically, Plaintiff says that jobs in the light and medium range require standing or walking, off and on, for about six hours in an eight-hour day. SSR 83-10.

Contrary to Plaintiff's assertion, the VE's conclusion that jobs in the light or medium range are available to a person with a sit-stand limitation is not in conflict with the definition of light or medium work. Under SSR 83-12, when a person cannot perform a full range of light or medium work due to a sit-stand limitation, the appropriate action is to consult a VE to define the specific positions still available. SSR 83-12; *see also Barrett*, 355 F.3d at

52

1067 (VE may testify as to jobs available for a subclass of light work where Plaintiff could only stand for two straight hours); *Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 547 (7th Cir. 2004) (ALJ properly identified jobs available to plaintiff with a sit-stand limitation when he relied on the testimony of a VE). ALJ Mondi followed this instruction. VE Gusloff, in turn, testified that under a hypothetical 30 minute sit-stand requirement, certain specific jobs would be available, such as an assembly inspector, an electrical assembler, an appliance assembler, or a chauffeur. (R. 434-35). He further explained that the electrical and appliance assembler positions could be set up to accommodate even a person who had to be able to sit or stand as needed. (R. 440). Therefore, VE Gusloff's determination that Plaintiff could perform light or medium work with a sit-stand limitation does not conflict with the DOT.

### 4.    Finding of Plaintiff's Transferable Skills

Finally, Plaintiff challenges the ALJ's finding that he had transferable skills. Under 20 C.F.R. § 404.1568, transferable skills are "skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." An ALJ who determines that a plaintiff has transferable skills must identify the plaintiff's acquired work skills and state specific occupations to which they are transferable. SSR 82-41. An ALJ may rely on VE testimony for these findings. *Id.*

Here, ALJ Mondi relied on VE Gusloff's analysis of Plaintiff's transferrable skills. (R. 358). VE Gusloff opined that Plaintiff's transferable skills included "assembly, and disassembly, and inspection, and troubleshooting in the light area." (R. 433-34). ALJ Mondi generally adopted this testimony and found that Plaintiff could "transfer skills to

exertionally light trucking jobs, such as a spotter." (R. 358). Plaintiff argues that reversal is warranted because the ALJ did not identify specific transferable skills. *See Key v. Sullivan*, 925 F.2d 1056, 1062 (7th Cir. 1991). However, in *Key*, the court remanded where "[t]he vocational expert . . . failed to testify that [the plaintiff] had in fact acquired skills that were transferable." *Id.* These facts are not present here. Nevertheless, and because the Court has already elected to remand, the ALJ should use that opportunity to specifically identify Plaintiff's transferrable skills.

Plaintiff also argues that the ALJ erred and exceeded his authority on remand in taking evidence on Plaintiff's transferable skills at the supplementary hearing, and then using that information in his second decision. Plaintiff contends that Judge Nolan's remand order did not expressly include a directive to redetermine transferable skills, and therefore the ALJ was without authority to address the issue.

Judge Nolan found that it was "necessary for the ALJ to reassess Plaintiff's credibility and his residual functional capacity," and remanded this matter back to the administration for further proceedings consistent with her opinion. *Demarco*, slip op., at 8. Under the relevant guidelines, when a case is remanded to an ALJ, the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). Since the Appeals Council vacated ALJ Mondi's first decision and remanded the case for proceedings consistent with Judge Nolan's order (R. 369), the initial decision was "set aside" in its entirety. 20 C.F.R. § 404.901. Therefore, ALJ Mondi had authority to revisit any and all parts of his original decision. *See e.g.,* Social Security Administration Office of Disability Adjudication and Review Hearings, Appeals and Litigation Law Manual,

54

("HALLEX"), I-2-8-19 (on remand from the district court, "[w]hen the Appeals Council vacates a final decision of the Commissioner, the ALJ must consider all pertinent issues *de novo*."); *see also Drossman v. Commissioner of Social Sec.*, No. 3:07-CV-376, 2008 WL 1848202, at *7 (N.D. Ohio Apr. 17, 2008) ("the subsequent Appeals Council order vacating 'the final decision of the Commissioner. . .' served to undo all findings in the VerWiebe decision except for those on which the district court's holdings relied."); *Everaert v. Barnhart*, No. 03-C-358-C, 2004 WL 903809, at *10 (W.D. Wis. Apr. 26, 2004) (rev'd in part on other grounds) ("when the Appeals Council remands a case, it vacates the ALJ's decision in its entirety. . .On remand, the ALJ is limited only by 20 C.F.R. § 404.977(b).").

Even if the Appeals Council had not vacated the initial decision, ALJ Mondi's reconsideration of Plaintiff's transferable skills is not inconsistent with his instruction to reconsider Plaintiff's RFC. As the Social Security Regulations explain, "[r]educed residual functional capacity (RFC) and advancing age are important factors associated with transferability because reduced RFC limits the number of jobs within an individual's physical or mental capacity to perform." SSR 82-41. Accordingly, the Court declines to remand on this basis.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 16] is granted in part and denied in part, and the clerk is directed to enter judgment in favor of Plaintiff. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated:   March 17, 2011

SHEILA FINNEGAN
United States Magistrate Judge